NOTICE

Decision filed 06/05/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230348-U

NO. 5-23-0348

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Vermilion County. |
| | ) | |
| v. | ) | No. 12-CF-596 |
| | ) | |
| MELVIN TURNER, | ) | Honorable |
| | ) | Derek J. Girton, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE VAUGHAN delivered the judgment of the court.
Justices Cates and Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*: Where there is no arguable reason to reverse the circuit court's finding that defendant failed to meet his burden of making a substantial showing of a constitutional violation and order denying his postconviction petition after a third-stage evidentiary hearing, we grant the defendant's appointed appellate attorney leave to withdraw as counsel and affirm the judgment of the circuit court.

¶ 2    Defendant, Melvin Turner, is nearing completion of his concurrent 25-year prison sentences for home invasion and armed robbery. He now appeals from the circuit court's order that denied his second amended postconviction petition following an evidentiary hearing. Defendant's appointed attorney on appeal, the Office of the State Appellate Defender (OSAD), concluded this appeal does not present an issue of arguable merit, and on that basis, filed with this court a motion to withdraw as counsel (see *Pennsylvania v. Finley*, 481 U.S. 551 (1987)), along with a memorandum of law in support thereof. This court gave defendant an opportunity to file a

1

*pro se* brief, memorandum, or other document explaining why OSAD should not be allowed to withdraw as counsel, or why this appeal has merit. Defendant has not taken advantage of that opportunity. This court has examined OSAD's *Finley* motion and the accompanying memorandum of law, as well as the entire record on appeal, and agrees with OSAD that this appeal lacks merit. Accordingly, we grant OSAD leave to withdraw as counsel and affirm the judgment of the circuit court.

¶ 3                                    I. BACKGROUND

¶ 4     Defendant was found guilty by a jury on three felony counts—home invasion (720 ILCS 5/12-11(a)(2) (West 2010)), armed robbery (*id.* § 18-2(a)(2)), and criminal trespass to a residence (*id.* § 19-4(a)(2)). The State's evidence consisted of the testimonies of several witnesses, including the two victims, Bryson Newsome, and Evony Jackson.

¶ 5     Bryson Newsome testified that on Sunday evening, December 2, 2012, he was at his Danville, Illinois, residence that he shared with his girlfriend, Evony Jackson, and their three-year-old daughter. Newsome was playing video games in the living room, and Jackson and their daughter were in Jackson's bedroom. Between 9 and 10 p.m., Newsome heard a knock at the back door and walked into the kitchen to answer it. When Newsome looked out the back door's window, he saw two men. Newsome recognized one of the two men as defendant; he and Newsome had attended the same Danville schools for "years." Newsome did not recognize the other man, who was "a dark man" facing away from the door and house. Because Newsome knew and recognized defendant, he unlocked and cracked open the door.

¶ 6     Newsome testified that defendant pushed open the door, and the defendant and the dark man stormed into the kitchen. The dark man struck Newsome in the left eye with a handgun. The two intruders took "$300 to $500" cash from Newsome's pocket and "threw" him to the kitchen

2

floor. Newsome lay on his side, looking straight ahead. He could "see feet and hear voices," but he could not see faces. At this time, Newsome saw three pairs of feet, not two. Newsome continued to lie on the floor, with the dark man pointing a gun at him. Newsome heard running through the house. Then, defendant walked back into the kitchen and said, "His girlfriend [*sic*] in the bedroom calling the police. Let's go." The three intruders departed through the back door. As they did, Newsome saw that the third intruder was "a light-skinned dude" whom he did not recognize. After the three intruders left, Newsome saw that a laptop computer and a PlayStation 3 were missing from the living room. According to Newsome, this entire incident lasted "two to three minutes, if that." A minute later, the police arrived at the house.

¶ 7 At that time, Newsome identified defendant as one of the robbers. According to Newsome, he had bumped into defendant at a gas station in Danville, between 4 and 5 p.m. on the day of the robbery. Defendant asked Newsome for a ride, and Newsome provided it. Defendant and Newsome were together when Newsome bought some marijuana, and defendant surely saw the fairly large amount of cash that Newsome had in his possession at the time. Newsome, however, declined to give officers permission to search his car for defendant's fingerprints. Newsome acknowledged that the police searched him at that time and found $2000 cash and cannabis in his pocket but stated that the $2000 was—at one point—in the bedroom with his girlfriend and daughter. Newsome also acknowledged that he had a 2007 conviction for possession of cannabis with intent to deliver.

¶ 8 On December 11, 2012, nine days after the robbery, Newsome met with police detective Dawn Hartshorn. She showed Newsome three different photo arrays, each consisting of photos of six different men, and he identified just one of the men—defendant—as one of the three robbers. Newsome was sure that defendant was one of the robbers.

3

¶ 9    Evony Jackson testified that on Sunday evening, December 2, 2012, she and her young daughter were at their Danville home. Newsome was also at the home. Jackson was in her bedroom, studying, as their daughter slept in the bed. Meanwhile, Newsome was in the living room, playing a video game. From her bedroom, Jackson heard a knock at the back door, and she saw Newsome stand up in the living room and walk toward the kitchen. Then, she heard someone say, "Get on the ground," and heard Newsome say, "Take whatever you want." Jackson quickly locked the door to her bedroom and immediately called 9-1-1. After a short while, she opened her bedroom door and saw "one person" walk into another bedroom of the house, turn on a light, and then walk away. Jackson saw the man's face as he walked into the other bedroom, but she "wasn't trying to look at extreme [*sic*] specific details." Jackson also heard another person say, "Stay down," and knew there was more than one intruder in the house. Still in her bedroom, Jackson heard one intruder say, in a loud voice, that the police had been called and that "they had to go." The police arrived at the house. The robbers had taken Jackson's new laptop computer and Newsome's new PlayStation.

¶ 10    That night, Jackson did not, and could not, identify any of the robbers. Jackson and Newsome decamped to Newsome's grandmother's house, due to Jackson's fear that the robbers would return to her own house. That same night, Jackson and Newsome discussed the robbery. When Newsome told Jackson "who it was," Jackson thought, "Oh, yeah, that's him." Jackson had attended school with defendant, starting in middle school and continuing through high school; they were not friends, but the schools in Danville were not large. A few years had passed since she had last seen defendant. In court, Jackson identified defendant as the intruder whom she saw walk into a bedroom near hers and turn on a light. She expressed complete confidence in her identification of the defendant.

4

¶ 11    On cross-examination, Jackson stated that she was also interviewed by Detective Hartshorn on December 11, 2012. Despite knowing defendant was involved based her conversation with Newsome, at that time Jackson told Detective Hartshorn that she was unable to identify any of the robbers. Jackson explained that she did not tell Detective Hartshorn that defendant was involved because she did not want any part of it and did not want to get in trouble at the nursing program she attended.

¶ 12    Prior to sentencing, defendant mailed the trial judge a hand-written letter that raised ineffective assistance of counsel claims. After a *Krankel* hearing, the court found that defendant failed to allege a credible claim that would have entitled him to the appointment of new counsel. The court then proceeded to a sentencing hearing. It found that the armed-robbery count and the criminal-trespass-to-residence count merged with the home-invasion count, and it sentenced defendant to 25 years in prison for home invasion.

¶ 13    Defendant appealed from the judgment of conviction. In his first direct appeal, the Illinois Fourth District Appellate Court reversed the trial court's denial of defendant's *pro se* ineffective assistance of counsel claims and remanded with directions that the court (1) conduct an adequate *Krankel* hearing and (2) sentence defendant on his armed robbery conviction. *People v. Turner*, 2015 IL App (4th) 130855-U, ¶ 43.

¶ 14    On remand, the trial court appointed counsel to represent defendant at his second *Krankel* hearing. At that hearing's conclusion, the court found there was an insufficient basis to find that trial counsel provided ineffective assistance.

¶ 15    Thereafter, the court concluded that a new sentencing hearing was not required and imposed a sentence of 25 years in prison for defendant's armed robbery conviction and directed that it be served concurrently with his previously imposed 25-year sentence on home invasion. It

entered an amended sentencing order that, in addition to the sentences for home invasion and armed robbery convictions, also included a conviction and four-year concurrent sentence for criminal trespass to a residence.

¶ 16    Defendant again appealed to the Illinois Fourth District Appellate Court. The Fourth District affirmed the sentence for armed robbery, vacated the conviction for criminal trespass to residence, and directed that the sentencing order be modified to reflect 255 days of credit for time served. *People v. Turner*, 2016 IL App (4th) 160031-U, ¶ 27.

¶ 17    On remand from the second direct appeal, the trial court entered a sentencing order that imposed a sentence of 25 years for home invasion and 25 years for armed robbery. It also reflected 255 days of credit for time served.

¶ 18    In April 2017, defendant filed a *pro se* petition for postconviction relief. See 725 ILCS 5/122-1 *et seq.* (West 2016). After more than 90 days elapsed without action from the circuit court, the court advanced the petition to the second stage of postconviction proceedings and appointed attorney Leon Parker as postconviction counsel for defendant.

¶ 19    Many delays followed. In July 2020, postconviction counsel filed an amended petition. In July 2020, the State filed a motion to dismiss the amended petition.

¶ 20    In November 2020, postconviction counsel filed a second amended petition. The second amended petition alleged (1) ineffective assistance of trial counsel, where counsel failed to investigate the defendant's alibi, despite him providing her with the names of two alibi witnesses, Autumn Robinson and Chevron Smith, and that he had been the subject of a traffic stop by Indianapolis police on the day of the robbery; (2) deprivation of due process from the use of perjured testimony of Bryson Newsome who was "coerced" by trial prosecutor Charles Mockbee into testifying that defendant was one of the intruders-robbers, even though Newsome had told

6

Mockbee that "he was not 100% sure" that defendant was involved; (3) ineffective assistance by appellate counsel who failed to raise the issue of ineffective assistance of trial counsel for failing to pursue defendant's alibi defense; and (4) a claim of actual innocence, where witness Bryson Newsome was "coerced" by trial prosecutor Charles Mockbee into testifying that defendant was one of the intruders-robbers, even though Newsome had told Mockbee that "he was not 100% sure" that the defendant was involved and where witness Newsome convinced Jackson to testify against defendant. Attached to the second amended postconviction petition were, *inter alia*, sworn affidavits from Autumn Robinson and Bryson Newsome. Autumn Robinson, in her sworn affidavit, wrote that on December 18, 2012, Detective Hartshorn phoned her. Detective Hartshorn asked Robinson whether defendant had been in Indianapolis on December 2, 2012, and Robinson originally replied that she did not know whether he had been there or not because, at that time, she was not talking to defendant due to a domestic dispute. She also told Detective Hartshorn that it was possible that defendant was in Indianapolis with his cousin. After speaking with Detective Hartshorn, Robinson phoned defendant's cousin in Indianapolis, Chevron Smith, and asked him whether defendant had been in Indianapolis around December 2. According to Robinson, Smith replied that defendant had been with him and other relatives, in Indianapolis, from November 29 to December 4. When Robinson learned the seriousness of this whole matter, she tried to contact defendant's attorney several times, and she instructed Smith to contact the attorney, but the attorney never responded to either one. Robinson expressed her understanding that she "should of [*sic*] been honest" with Detective Hartshorn from the start, "instead of being upset with [defendant] about our domestic dispute."

¶ 21 Bryson Newsome, in his sworn affidavit, wrote that in July 2013, just prior to defendant's trial for breaking into the house of Newsome's then-girlfriend, Newsome spoke with the trial

7

prosecutor Mockbee. Newsome told Mockbee that although he told Detective Hartshorn that defendant was one of the three intruders-robbers, he was "not a [*sic*] 100% sure" due to his "smoking weed and drinking liquor all day even minutes before the knock on the door that led to [the] attack." Nevertheless, prosecutor Mockbee "coerced" him into testifying against defendant, stating that he needed to convict defendant in order to "set an example for those who choose to live the street life" and explaining that convicting defendant would be "easy" because of his criminal background. "With that information," Newsome agreed to testify against defendant and "even convinced [his] then girlfriend Evony Jackson to also testify against him." Years after the trial, Newsome "felt that the truth needed to be known." Therefore, Newsome "reached out" to defendant and his family, seeking forgiveness for his "false testimony" against defendant. Newsome found out "later" that someone other than defendant had broken into and robbed his former girlfriend's house.

¶ 22    Postconviction counsel filed a certificate of compliance with Illinois Supreme Court Rule 651(c) (eff. July 1, 2017). Counsel certified that he consulted with defendant, by telephone and by mail, in order "to ascertain his contentions" regarding postconviction relief; "reviewed the court file and transcripts of the trial and prior hearings"; and "made the necessary amendments" to the *pro se* petition for "an adequate presentation" of defendant's contentions.

¶ 23    The State, instead of filing a motion to dismiss the second amended petition, chose to rely on its previously filed motion to dismiss the amended petition, which it had filed in July 2020. After a hearing on the State's motion to dismiss, the court granted the State's motion and dismissed the defendant's second amended petition.

¶ 24    Defendant appealed, and OSAD was appointed to represent defendant. The Illinois Fourth District Appellate Court reversed the dismissal of the second amended postconviction petition,

8

finding defendant's claim of actual innocence arguably meritorious. The Fourth District remanded for an evidentiary hearing. *People v. Turner*, 2022 IL App (4th) 200632-U, ¶ 47.

¶ 25   On remand—in late January 2023—Judge Derek J. Girton discussed with the parties "a potential conflict [of interest]" involving the trial prosecutor, assistant State's attorney Charles D. Mockbee IV. Mockbee was now a Vermilion County judge and had been subpoenaed in the case. According to Judge Girton, his own office was "literally next door" to Judge Mockbee's office. Judge Girton raised the possibility of having a judge from outside the circuit preside at the evidentiary hearing. Thereafter, defendant waived the potential conflict after being thoroughly informed of the conflict and discussing it with postconviction counsel.

¶ 26   On May 10, 2023, the court held an evidentiary hearing on defendant's second amended postconviction petition. Defendant called three witnesses at the evidentiary hearing—Bryson Newsome, Autumn Robinson, and himself. Mockbee was not called as a witness at the evidentiary hearing.

¶ 27   Bryson Newsome testified that although he remembered the robbery, he did not remember seeing defendant's face during the robbery. On the night of the robbery, Newsome believed defendant was one of the three men who had robbed him. Newsome also remembered telling police officers, on the night of the robbery, that defendant was one of the robbers, and he had spent time with defendant earlier that day. However, his memory was hazy that night because he was a heavy drug abuser at the time and high on the night of the robbery. Newsome also acknowledged that he identified defendant in a photo array, shortly after the robbery. Newsome recalled that at defendant's trial, he "believed it was [defendant]" who was among the three men who had entered his house. In other words, he believed that defendant was one of the three robbers. However, "years later," he "found out it wasn't him." It was in 2016 or 2017 that Newsome learned from a woman

9

that he used to work with, Melina Smith, that defendant was not involved in the robbery. Newsome averred, "She said her brother was involved" in the robbery, and her brother was not defendant.

¶ 28    On cross-examination, Newsome admitted that Melina's brother's involvement in the robbery did not exclude the possibility that defendant was also involved; her brother could have been one of the two robbers whom Newsome did not recognize. Newsome admitted to giving false testimony at defendant's trial. He did not believe that it was defendant who came to his apartment on December 2, 2012, and robbed him. Newsome admitted writing in his affidavit that the prosecutor at defendant's trial had "coerced" or "bribed" him into testifying that defendant was one of the robbers, but explained Mockabee convinced him that defendant was one of the robbers. He stated this happened shortly before the trial. Newsome then confirmed that on the night of the robbery, and at defendant's trial, he had no doubt that the defendant was one of the robbers.

¶ 29    Autumn Robinson testified that she was defendant's "significant other" in December 2012. Robinson and defendant lived with Robinson's grandmother, at the grandmother's house in Danville. She testified that she and defendant got into an argument a few days before Detective Hartshorn called her because defendant was going out of town to spend time with friends and family. Defendant left town either November 28 or 29 and returned around December 4. Robinson testified that defendant told her he went to Indianapolis. She knew that he was in Indiana on December 2, 2012, because she could hear him speaking with his cousin Chevron—who lived in Indianapolis—in the background when he was on the phone with her and—defendant would never lie to her about his whereabouts. However, when police detective Dawn Hartshorn phoned Robinson and asked her whether defendant was in Indianapolis on December 2, Robinson replied that she did not know because defendant was on parole, and she did not want him to get into trouble for being outside of Illinois. Robinson acknowledged that in her affidavit, she did not mention

parole as her reason for not being straightforward with Hartshorn. She averred that defendant left Danville in late November 2012 and returned on December 4, 2012. When Robinson became aware of defendant's legal problems in this case, she "tried to" contact the defendant's attorney, Gloria Morris, on "multiple" occasions in advance of defendant's trial, but Morris never returned her phone calls. Robinson wanted to tell Morris that the only reason she did not inform Hartshorn about defendant's presence in Indianapolis on the date of the crime was her fear that it would cause problems for his parole. Robinson attended defendant's trial and was available to testify.

¶ 30 Finally, defendant himself testified. According to the defendant, he was in Indianapolis with his cousin Chevron Smith and other relatives on December 2, 2012. He left Danville for Indiana shortly after Thanksgiving and returned on December 4 or 5, 2012. Defendant averred he was stopped by Indianapolis police, and issued a traffic citation at the time the crime in this case was committed. Defendant told his trial attorney about that traffic stop, and he gave her Smith's name, but she did not investigate his alibi.

¶ 31 The circuit court heard the arguments of counsel. Then, it discussed the evidence adduced at the evidentiary hearing. It determined that the evidence that defendant was in Indianapolis on the date of the crime "comes down to nothing other than [defendant's] word that he was in Indianapolis." There was, for example, no traffic citation from Indianapolis police and Robinson provided only a belief based on her phone calls with defendant during that time and speaking with Smith two weeks after the event occurred. It further found Newsome's trial testimony was believable to the jury at the defendant's trial but his testimony at the evidentiary hearing was not credible "at all." The court further stated even if Melina Smith's brother was involved in the home invasion, there is no reason to conclude that defendant was not involved in it, because the brother could have been one of the two intruders Newsome did not recognize. The court concluded that

11

defendant had failed to meet his burden at the evidentiary hearing, and his second amended postconviction petition was denied.

¶ 32    Defendant filed a notice of appeal from the denial. The court appointed OSAD as the defendant's appellate attorney.

¶ 33                                                II. ANALYSIS

¶ 34    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)) provides a method by which any imprisoned person may assert that his conviction or sentence resulted from a substantial violation of his federal or state constitutional rights. *Id.* § 122-1(a)(1); *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006). A proceeding under the Act is a collateral proceeding, not an appeal from the judgment of conviction. *People v. English*, 2013 IL 112890, ¶ 21. Postconviction proceedings may consist of as many as three stages. *Id.* ¶ 23.

¶ 35    A criminal defendant initiates proceedings under the Act by filing a petition in the circuit court. 725 ILCS 5/122-1(b) (West 2020). The Act requires the circuit court to examine a defendant's postconviction petition, and enter an order thereon, within 90 days after the petition is filed and docketed. *Id.* § 122-2.1(a). If the court fails to rule on the petition within the 90-day timeframe—as was the situation here—the case must be docketed for further consideration at the second stage of postconviction proceedings. *Id.* § 122-2.1(b); *Pendleton*, 223 Ill. 2d at 472. At the second stage, counsel may be appointed for the defendant, if the defendant is indigent (725 ILCS 5/122-4 (West 2020)), and postconviction counsel must consult with the defendant to ascertain his contentions of constitutional deprivation, must examine the record of the proceedings at the trial, and must make any amendments to the *pro se* petition that are necessary for an adequate presentation of the petitioner's contentions. Ill. S. Ct. R. 651(c) (eff. July 1, 2017). The State may then move to dismiss the petition or the amended petition. 725 ILCS 5/122-5 (West 2020). If the

12

State is unsuccessful in moving to dismiss the petition at the second stage, the cause advances to the third stage of postconviction proceedings, where the circuit court conducts an evidentiary hearing, and the defendant may present evidence to establish the truth of his petition's factual allegations. *Pendleton*, 223 Ill. 2d at 472-73.

¶ 36 "Throughout the second and third stages of a postconviction proceeding, the defendant bears the burden of making a substantial showing of a constitutional violation." *Id.* at 473. When a petition is advanced to a third-stage evidentiary hearing, the court engages in fact-finding, credibility determinations, the weighing of testimony and evidence, and it resolves evidentiary conflicts. *People v. Domagala*, 2013 IL 113688, ¶ 34; *People v. Coleman*, 183 Ill. 2d 366, 384 (1998). The court's decision will be reversed only if this court concludes that the decision was manifestly erroneous. *Coleman*, 183 Ill. 2d at 384. A decision is manifestly erroneous only if it is "arbitrary, unreasonable, and not based on the evidence." *People v. Wells*, 182 Ill. 2d 471, 481 (1998).

¶ 37 As its first potential issue in this appeal, OSAD raises the question of whether the circuit court's denial of relief to defendant, after an evidentiary hearing, was manifestly erroneous. Defendant's petition advanced to an evidentiary hearing on claims of (1) a due process violation based on the State's knowing use of perjured testimony and (2) actual innocence. *Turner*, 2022 IL App (4th) 200632-U, ¶¶ 41-45.

¶ 38 As for a due process violation based on the State's knowing use of perjured testimony, defendant "must present clear, factual allegations of perjury and not mere conclusions or opinions." (Internal quotation marks omitted.) *People v. Moore*, 2012 IL App (4th) 100939, ¶ 28. Moreover, perjury concerns false testimony, not testimony that is merely inconsistent. See *People v. Laboy*, 227 Ill. App. 3d 654, 662 (1992). In his postconviction petition, defendant alleged that

13

trial prosecutor Mockbee had "coerced" Newsome into identifying defendant at trial. While Newsome's affidavit supported defendant's allegation, the court found his testimony that he now believed defendant was not involved was not credible. Because the circuit court stands in the best position to weigh the credibility of the witnesses, we give deference to the circuit court's credibility determinations. *People v. Hotwagner*, 2015 IL App (5th) 130525, ¶ 31. Moreover, although Newsome testified that he gave false testimony at trial and that Mockabee convinced him that defendant was involved, he clarified at the evidentiary hearing that he had no doubt that defendant was one of the robbers at the time he identified defendant at trial and that based on a conversation with a coworker, he no longer believed defendant was one of the robbers. If Newsome thought that defendant was one of the robbers at the time of trial, his testimony was not false and therefore not perjury. As such, there is no meritorious argument that the court manifestly erred in denying defendant's due process claim.

¶ 39     In regard to the postconviction claim of actual innocence, a court should grant relief only if the defendant presents new, material, noncumulative evidence that is so conclusive that it would probably change the result on retrial. *People v. Washington*, 171 Ill. 2d 475, 489 (1996). The court found that the only evidence that the defendant was in Indiana at the time of the robbery was the defendant's unsubstantiated word on the matter. Robinson claimed defendant was in Indiana, but her affidavit did not entirely line up with her testimony at the evidentiary hearing. Regardless, Robinson admitted that she had no firsthand knowledge of defendant's whereabouts on December 2, 2012, and only believed he was in Indiana based on defendant's and his cousin's word. While defendant asserted that he was ticketed in Indiana on the date in question, there was no objective evidence that defendant was pulled over or ticketed in Indiana. Therefore, there is no arguably

14

meritorious issue that the circuit court manifestly erred in denying the defendant's actual-innocence claim.

¶ 40    As its second potential issue on appeal, OSAD raises the question of whether postconviction counsel provided a reasonable level of assistance. The Act gives a defendant a statutory right to counsel, and the defendant is entitled to a reasonable level of assistance from counsel. 725 ILCS 5/122-4 (West 2020); *People v. Turner*, 187 Ill. 2d 406, 410 (1999). Whether reasonable assistance was provided is a matter that this court decides *de novo*. *People v. Watson*, 2022 IL App (5th) 190427, ¶ 41. To ensure that a defendant receives reasonable assistance, Illinois Supreme Court Rule 651(c) (eff. July 1, 2017) requires a showing in the record, which may be made by way of a certificate from postconviction counsel, that counsel consulted with the petitioner to ascertain his contentions of deprivation of constitutional rights, examined the record of the proceedings at trial, and "made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of petitioner's contentions." If counsel files a certificate that substantially complies with Rule 651(c), "a presumption is raised that counsel complied with that rule, and the burden is on the defendant to rebut that presumption." *People v. Carrizoza*, 2018 IL App (3d) 160051, ¶ 13.

¶ 41    Here, postconviction counsel filed a certificate that substantially complied with Rule 651(c). Nothing in the record serves to contradict the presumption that counsel complied with that rule and provided reasonable assistance. As OSAD notes, there is no arguably meritorious claim that postconviction counsel failed to satisfy the Act's reasonableness standard.

¶ 42    Finally, as its third potential issue on appeal, OSAD raises the question of whether Judge Girton "suffered from a conflict of interest" where his office was next door to that of Judge Mockbee, who had been the prosecutor at defendant's trial, and if so, whether defendant waived

15

any conflict. Illinois Supreme Court Rule 2.11 (eff. Jan. 1, 2023) lists and discusses the various circumstances in which a judge shall disqualify himself or herself; none of which apply here. A judge is presumed impartial, and the burden of overcoming that presumption rests on the party alleging prejudice. *People v. Faria*, 402 Ill. App. 3d 475, 482 (2010). Here, Judge Girton had no specific basis to be disqualified from presiding at defendant's evidentiary hearing, and Judge Mockbee did not ultimately testify at that hearing, despite his being subpoenaed. Moreover, Rule 2.11(c) allows the judge to participate in the proceeding if the parties agree the judge should not be disqualified after the judge discloses the potential basis for disqualification and the parties consider whether to waive disqualification outside the presence of the judge and court personnel. Ill. S. Ct. R. 2.11(C) (eff. Jan. 1, 2023). After the court informed defendant of the potential conflict and offered to send the case to be re-assigned to an out-of-county judge, counsel indicated he discussed the matter with defendant and defendant waived the potential conflict. Thus, there is no merit to the argument that Judge Girton should not have presided over defendant's evidentiary hearing.

¶ 43                                    III. CONCLUSION

¶ 44    At the third-stage evidentiary hearing on his second amended postconviction petition, defendant failed to make a substantial showing of a constitutional violation. Therefore, the circuit court did not err in denying defendant's petition. No argument to the contrary would have substantial merit. Accordingly, we grant OSAD's motion to withdraw and affirm the judgment of the circuit court.


¶ 45    Motion granted; judgment affirmed.